George Ronald WRIGHT, Plaintiff, Appellant, and Cross–Respondent,

v.

WESTSIDE NURSERY, a Utah limited partnership, and Darrel Humphries, an individual, Defendants, Respondents, and Cross–Appellants.

No. 880544–CA.

Court of Appeals of Utah.

Feb. 2, 1990.

Gary W. Pendleton, St. George, for plaintiff, appellant, and cross-respondent.

Hans Q. Chamberlain, Cedar City, for defendants, respondents, and cross-appellants.

Before BENCH, BILLINGS and ORME, JJ.

ORME, Judge:

Plaintiff George Wright ("Wright") appeals from several adverse rulings made during the course of trial in this complicated case. Defendants Westside Nursery and Darrel Humphries ("Humphries") cross-appeal from two postjudgment rulings in the same case. We affirm in part, reverse in part, vacate in part, and remand to the trial court for further proceedings consistent with this opinion.

The numerous issues raised on appeal require, regrettably, a somewhat laborious presentation of the facts. Except where the discrepancies are identified, the facts as set forth are essentially undisputed.

## PRETRIAL FACTS

Humphries was general partner and manager of Westside Nursery located in St. George, Utah. In 1985, Wright contracted with Westside Nursery to landscape his residence in St. George. During this time, Wright and Humphries began to discuss the possibility of Wright purchasing the nursery. At some point in the negotiations, the parties agreed Wright would exchange real estate for the nursery.

In August 1985, Humphries flew to Ogden, Weber County, where Wright owned several acres of land, and stayed the night in Wright's home. There was conflicting evidence about whether the parties were contemplating the property exchange at this time and about whether Humphries viewed the property during this visit.

In October 1985, Humphries and his wife traveled to the Ogden area. On October 4th, the parties spent several hours reviewing and revising two agreements which had been previously drafted by Wright's attorney. The first agreement, the Agreement for Purchase of Assets ("Purchase Agreement"), concerned the exchange of the property for the nursery. The second, the Contract for Management Services ("Management Agreement"), concerned Wright's employment of Humphries as nursery manager. The agreements were signed and deeds were executed conveying the Weber County property to Humphries.

Although Humphries inspected the property on the same day that the contracts were executed, the parties disagree on whether he saw it before or after the execution. Humphries testified that he saw it only afterward. While showing Mr. and Mrs. Humphries the property, Wright identified several surrounding parcels of property and the range of prices for which they had been purchased. He also pointed out that there was no sewer currently servicing the area, but informed Humphries that he expected one to be installed within a year and a half. No evidence was admitted to suggest that any of this information was false. Moreover, the sewer was in fact installed within two years.

Humphries' position throughout the trial was that Wright had represented the Weber County property as being worth at least $90,000. He alleged that Wright told him this on October 4th when they went to see the property. Wright consistently maintained that the property was indeed worth $90,000, but denied ever having made this

representation prior to executing the contracts.

Wright admitted during the trial that he did not know the exact value of the property. There was no evidence to suggest that an appraisal had ever been made of the property prior to this litigation. However, Wright did testify about the selling price of similar properties in the surrounding area. Moreover, he introduced evidence that the property was valued at approximately $104,000 for tax purposes. The parties each introduced expert testimony concerning the value of the property as of when the transaction was finalized. The appraisals covered a wide range, from $35,000 to $84,000. Humphries testified that he sold the property for $54,700, to a neighboring landowner, a few days before trial.

Meanwhile, on October 15, 1985, only a few days after the transaction closed, the Weber County Commission declared a limited moratorium on the area which contained the subject parcel of land. The moratorium prevented owners from building subdivisions on the affected land without approval from the commission. Evidence was introduced demonstrating that Wright knew of the potential for this moratorium before the October 4th closing but did not disclose the possibility to Humphries. However, Wright introduced unrebutted evidence he had spoken to several governmental officials about the potential moratorium and that they had led him to believe the moratorium would probably not be declared and that, if it were, his property would probably receive approval for development anyway.

After execution of the contracts and before the end of November 1985, Humphries claims he heard rumors that the Weber County Property might not be worth $90,000. He then made some inquiries and determined that he had been defrauded. On December 10, 1985, Humphries' attorney wrote a letter to Wright expressing his suspicions and proposing to settle the dispute. On December 18, the attorney wrote a second letter informing Wright that Humphries considered the Purchase Agreement cancelled and rescinded.

On December 23, Wright initiated an action to determine the ownership of the nursery. On the same day, the trial court issued a temporary restraining order which prohibited Humphries from doing anything with the nursery inconsistent with Wright's ownership and prevented him from incurring further debt on behalf of Wright or the nursery.

From October 1985 through March 1986, Humphries managed the nursery pursuant to the Management Agreement and drew a salary of $2,500 per month. Prior to the sale of the nursery to Wright, Humphries had obtained a $15,000 loan from Zions Bank which he remained obligated to pay under the Purchase Agreement. Subsequent to the sale, Humphries signed a second promissory note for $30,000 in favor of Zions Bank. He drew $15,000 against the note on December 13, 1985, prior to the December 23 restraining order. On December 30, he drew an additional $5,000 on the note, and the remaining $10,000 on January 6, 1986. The entire $30,000 was, at least initially, deposited into the nursery account.

In March 1986, Wright sought possession of the nursery. The trial court ordered Humphries to relinquish his possession of the nursery to Wright, imposed various duties on the parties, and appointed a receiver to assist the court in monitoring the business and the parties' compliance with its order. As a condition to issuance of this second temporary restraining order,[1] the court ordered Wright to procure a $50,000 injunction bond. Wright did so. He then discharged Humphries and took possession of the nursery.

### LITIGATION FACTS

As indicated, Wright filed a complaint against Humphries in December 1985. In due course, Humphries answered the complaint and raised various counterclaims. On September 17, 1986, a hearing was held

---

**1.** Although captioned as a temporary restraining order, the March order giving Wright possession of the nursery was procedurally, and in substance, a preliminary injunction.

concerning several pending motions. Most significantly, the district court found that Humphries had waived his right to seek rescission of the contract and that adequate remedies existed at law. Therefore, the court dismissed Humphries' claim for rescission with prejudice.

The balance of the dispute was tried to a jury in April 1988, and trial took five days to complete. Wright attempted to establish that Humphries had breached the contracts by misappropriating nursery money for his own use and borrowing funds from Zions Bank without authorization and therefore should not be reimbursed for any of those monies. Humphries attempted to establish that Wright had induced him to enter into the contract by fraudulently misrepresenting the value of the property. He also introduced evidence to suggest that Wright had tortiously failed to disclose the potential moratorium, although the jury was never instructed regarding fraudulent omission. Both parties argued for attorney fees and Humphries introduced evidence that he had incurred over $30,000 in attorney fees and costs. The case was submitted to the jury for special verdicts in accordance with Utah R.Civ.P. 49(a).

The jury returned the following special verdicts: (1) Humphries breached the agreements between the parties and as a result should pay Wright $6,805; (2) Wright breached the agreements by terminating Humphries and should pay Humphries $15,000; (3) Wright breached the agreements in other respects but no damages resulted; (4) Wright should pay up to $5,000 in accounts payable existing prior to the transaction; (5) Humphries should pay such accounts beyond $5,000; (6) Humphries should receive the accounts receivable prior to October 4, 1985; (7) Humphries should pay the $15,000 loan acquired prior to October 4, 1985; (8) Wright should pay the $30,000 loan acquired after October 4, 1985, with interest; (9) Wright made fraudulent misrepresentations about the value of the property and should pay Humphries $38,582 in damages; (10) Wright should pay Humphries $10,000 in attorney fees.

The foreman of the jury was questioned by the court concerning the $6,805 award for Humphries' breach of the contracts. The foreman explained that the amount represented various payments Humphries had made out of the nursery account which the jury found he misappropriated to his own use.

After the trial, Wright moved for judgment notwithstanding the verdict and for the court to exonerate the injunction bond. The court denied the motions. It did, however, deny the $15,000 award to Humphries because the court found as a matter of law that Humphries had been properly terminated given the jury finding he misappropriated nursery funds. In its judgment on the verdict, the court affirmed all of its previous orders including the two restraining orders. In total, it awarded Humphries a judgment of $68,780.21, to bear interest at the legal rate until paid in full.

Most of the net award to Humphries came directly from the special verdict. However, $20,198.21 of the award bears some additional explanation. The jury found that Wright was obligated to pay the $30,000 loan from Zions Bank plus interest which had accrued as of the date of trial. The interest amounted to approximately $7,000. From the $37,000 total, the court subtracted approximately $17,000. This amount represented the nursery account monies that Humphries had misappropriated to himself, as found by the jury, and additional sums paid for legitimate nursery expenses for which Humphries was liable under the jury's verdict. In essence, the court did not agree with the jury that Wright was actually liable for the $30,000 loan. Instead, the court held that Wright was obligated to reimburse Humphries for that portion of the $30,000 loan which made its way into the nursery account and was used to pay obligations for which Wright was ultimately responsible.

On appeal, Wright makes the following arguments: (1) Humphries failed to prove a prima facie case of fraudulent misrepresentation; (2) the jury determination of the value of the real property at the time of the transaction was unsupported by the evi-

dence; (3) the evidence was insufficient to demonstrate that Wright should indemnify Humphries for the $30,000 loan from Zions Bank; (4) Humphries was not entitled to attorney fees; and (5) the district court erred in failing to exonerate the injunction bond. Humphries cross-appeals and makes the following arguments: (1) The district court erred in dismissing the $15,000 jury award for Humphries' wrongful termination; (2) the district court erred in failing to award prejudgment interest on the $38,582 fraud award; and (3) this court should direct the trial court to amend its judgment to include postjudgment interest, costs, and attorney fees on the part of the judgment premised on Wright's obligation to pay most of the amount attributable to the $30,000 note. We will discuss each of these claims.

## FRAUD

■ Wright argues on appeal that the jury did not have sufficient evidence upon which to base its verdict of fraud. We of course consider the evidence in a light favorable to the verdict and "we will not substitute our judgment for that of the jury where the verdict is supported by substantial and competent evidence." *Von Hake v. Thomas*, 705 P.2d 766, 769 (Utah 1985). Moreover, Wright's duty on appeal is to "marshal all the evidence supporting the verdict and demonstrate that, even viewing the evidence in the light most favorable to that verdict, the evidence is insufficient to support it." *Id.* (citing *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985)). With this standard of review in mind, we note that Wright's marshaling of the evidence is adequate to permit our consideration of this issue.[2]

At trial, Humphries had the burden to prove all the essential elements of the fraud claim. *Pace v. Parish*, 122 Utah 141, 247 P.2d 273, 274 (1952). Although both parties address two fraud theories on appeal—fraudulent misrepresentation concerning the value of the property and fraudulent concealment of the building moratorium—the jury was only instructed regarding the first theory. We cannot affirm the verdict based upon a theory which was not presented to the jury for consideration. Consequently, Humphries may only prevail if he sustained his burden of proving each element of the fraudulent misrepresentation claim. He failed to meet this burden.

■ The elements of a fraudulent misrepresentation claim are:

(1) That a representation was made; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.

*Pace*, 247 P.2d at 274–75. Distilling the argument somewhat, Wright basically argues that the evidence was insufficient to support elements 2 (material fact) and 4 (mental state). Because the representation of value, if made, was a matter of opinion and not of fact, we need not address the sufficiency of the evidence regarding Wright's state of mind.

■ Humphries alleged at trial that Wright had falsely represented the value of the Weber County property. However, "misrepresentations as to value do not ordinarily constitute fraud, as they are regarded as mere expressions of opinion or 'trader's talk' involving matter of judgment and estimation as to which men may differ." *Baird v. Eflow Inv. Co.*, 76 Utah 232, 289

---

**2.** Wright beseeches us to make a thorough review of the whole record, which fills a box the size of an orange crate. We do not apologize for declining Wright's invitation. The very purpose of such devices as the "marshaling" doctrine and R. Utah Ct.App. 24(a)(7), requiring that all references in briefs to factual matters be supported by citations to the record," is to spare appellate courts such an onerous burden. Absent exceptional circumstances, our review of the record is limited to those specific portions of the record which have been drawn to our attention by the parties and which are relevant to the legal questions properly before us.

P. 112, 114 (1930). *See also Frazier v. Southwest Sav. & Loan Ass'n,* 134 Ariz. 12, 653 P.2d 362, 365 (Ct.App.1982) ("Mere representations as to value are generally considered expressions of opinion and will not support a claim for fraud."); *Dolson Co. v. Imperial Cattle Co.,* 191 Mont. 357, 624 P.2d 993, 996 (1981) ("Statements as to the value of property are generally considered declarations of opinion...."); *Davis v. Schiess,* 417 P.2d 19, 21 (Wyo. 1966) ("[A]n expression of opinion as to value is not fraud."). Indeed, the jury was instructed to this effect.[3]

Although usually opinion, expressions of value have occasionally been regarded as fraudulent misrepresentations of fact. Mostly, parties have prevailed when they have offered "substantial evidence to show bad faith or to show the expression of value was not [the owner's] real opinion." *Davis,* 417 P.2d at 21. *See also Baird,* 289 P. at 114 (listing examples of the kinds of bad faith indicia which demonstrate that the representation is not a bona fide opinion).[4] In this case, however, the record is devoid of any evidence of this kind.

In his brief, Humphries points to three facts which he believes demonstrate that the representation of value was made in bad faith and was not Wright's honest opinion: (1) Wright did not know the actual value of the property when he made the statement because the property had not been appraised; (2) Wright referred to the selling price of other properties in the development when he allegedly gave Humphries his estimate; (3) Wright failed to disclose the potential building moratorium. We will discuss each of these facts.

The fact that the property had not been appraised before Wright made his representation does not support Humphries' argument. The law does not require a landowner to obtain an appraisal before he or she can state an opinion about the value of his or her land.[5]

Humphries may not prevail under his second argument, i.e., that Wright made reference to the price of other similar properties. Initially, it is difficult to see how Humphries can seriously make this argument. His own position at trial was that he signed the contract *before* Wright took him to view the property and made reference to the surrounding properties. How, then, could these statements about the value of adjacent property have been relied on by Humphries in deciding to enter into the contract? Moreover, Humphries introduced no evidence to suggest that any of the statements concerning the surrounding properties were false in any way. There was simply no evidence of bad faith concerning statements about the surrounding properties from which the jury could have inferred that Wright's representation was other than honest opinion.

Thirdly, Humphries argues that the failure to disclose the potential moratorium evidenced bad faith and the disingenuousness of Wright's opinion. The only fact to support this argument is that Wright knew of the potential moratorium before the transaction. However, the moratorium was placed on the property after the transaction was formalized and Wright consistently testified that public officials had encouraged his belief that the moratorium, if

**3.** Jury Instruction No. 26 included this statement: "The value of property is subjective. It is a matter of opinion."

**4.** When an owner's opinion of value is the basis of the fraudulent misrepresentation claim, courts are primarily concerned with whether or not the stated value was in fact the owner's actual opinion. In a sense, these cases do not really represent exceptions to the usual rule that the operative misrepresentation be of a presently existing fact. Rather, the owner implicitly represents a fact when he gives his opinion, namely that he presently holds the opinion he is giving. If the stated value is truly the owner's opinion then the buyer may not base his or her

fraud claim on that opinion, regardless of the accuracy of the opinion. On the other hand, if the evidence suggests that the stated value was not the owner's true opinion, this *fact* may be the basis of a fraudulent misrepresentation claim.

**5.** If an owner is competent to give evidence on the market value of his property, as the jury was correctly instructed in Jury Instruction No. 27, it is logical to assume that he may competently give an opinion of the value without first obtaining an appraisal. Otherwise, he would merely be passing along the appraiser's opinion.

imposed, would not be a problem—a conclusion borne out by subsequent events. Although the depositions of these public officials had been taken prior to trial, Humphries introduced no evidence to rebut Wright's testimony. Thus, there was no substantial, competent evidence from which the jury could have found Wright falsely stated his opinion as to the value of the property because of what he knew about the potential moratorium.[6]

In contrast to Humphries' lack of evidence regarding bad faith, Wright introduced evidence to show his good faith, including the property tax assessment of $104,688 and his unrebutted testimony that he knew of similar properties in the area which had sold for comparable prices.

We conclude our discussion of the fraud issue with the observation that while the

> law provides reasonable protection to purchasers against fraud and deceit[,] ... it does not go to the romantic length of offering indemnity against the adverse consequences of folly and indolence or a careless indifference to information which would enlighten the purchaser as to the truth or falsity of the seller's assertions as to value.

*Dolson,* 624 P.2d at 996. The record does not disclose any reason, other than his own blind reliance upon Wright's representations, why Humphries chose to formalize the transaction prior—at least as he recalled—to even viewing the property, much less making independent inquiry or obtaining his own appraisal. "It is reasonable to expect that ... vendors would attach the highest possible value to the property. Indeed, it would be unreasonable to assume otherwise, and purchasers who rely on such representations proceed at their own risk." *Id.* at 997. *See also Pace,* 247 P.2d at 275 ("[P]laintiffs did not use reasonable care and diligence [and] were, therefore,

not entitled to rely on the representation...."); *Baird,* 289 P. at 114 ("There was nothing done by the defendants to prevent the plaintiff from making the fullest inquiry and investigation concerning the value of the apartments.").

In the absence of substantial and competent evidence of bad faith on Wright's part, we must reverse the fraud verdict.[7]

## "INDEMNIFICATION"

■ Wright argues that there was insufficient evidence for the jury verdict requiring him to "indemnify" Humphries for the $30,000 loan from Zions Bank. As noted in the foregoing section, when an appellant challenges the sufficiency of evidence, his duty on appeal is to "marshal all the evidence supporting the verdict and demonstrate that, even viewing the evidence in the light most favorable to that verdict, the evidence is insufficient to support it." *Van Hake v. Thomas,* 705 P.2d 766, 769 (Utah 1985) (citing *Scharf,* 700 P.2d at 1070).

Unlike his marshaling with respect to the fraud verdict, Wright's marshaling of the evidence for this argument was inadequate. He completely failed to identify and explain any of the evidence supporting the jury verdict. *See also* note 2, *supra.* On the other hand, Humphries refers us to numerous facts from the record upon which the jury could have based its verdict. We will not disturb the jury verdict where, as here, appellant has completely failed to sustain his burden of marshaling the evidence.

■ In addition to challenging the sufficiency of the evidence, Wright argues that the jury was improperly instructed regarding Humphries' burden to establish his right to reimbursement of monies he expended in connection with the nursery busi-

---

**6.** As noted previously in this opinion, Humphries failed to have the jury instructed on a fraudulent omission claim. Had the jury been instructed under this alternative theory, we would be more inclined to affirm the verdict based upon Wright's failure to inform Humphries of the potential moratorium. However, in the context of a fraudulent misrepresentation claim premised on a statement of value, the

mere omission of the moratorium information bears little weight given the record before us.

**7.** Because we reverse the fraud verdict, we need not discuss Wright's arguments that the jury improperly determined the award for that claim or Humphries' claim that he was entitled to prejudgment interest on the fraud award.

ness. We have considered this argument and find it to be without merit. The jury heard conflicting evidence about whether Wright instructed or encouraged further indebtedness and about the use of loan proceeds after they were placed in the nursery account. We believe the jury could reasonably conclude from the instructions given and evidence adduced that Humphries was entitled to reimbursement of the basic amounts found due by the jury. Thus, we affirm as to the "indemnification" issue.

### POSTJUDGMENT INTEREST, COSTS AND FEES ON $30,000 AWARD

■ Humphries argues that Wright should be obligated to pay all amounts which are incurred postjudgment in connection with the $30,000 promissory note, including interest as set forth in the note and any costs and attorney fees which he may incur as a result of collection action taken on the note. We disagree.

The applicable special verdict regarding the $30,000 loan from Zions Bank might have been more artfully phrased. However, the court clearly and correctly concluded from the jury's findings that Wright was obligated to pay that portion of the borrowed $30,000 which was deposited into the nursery account and legitimately used for nursery purposes for which Wright, rather than Humphries, was properly chargeable. Thus, in calculating a lump sum which Wright should pay to Humphries, the court began with the $30,000 plus interest accrued as of the date of trial. From this amount, the court subtracted various sums which Humphries was obligated to pay either because he had misappropriated funds or because he was properly chargeable for them under the parties' arrangement.

Although the parties have argued in terms of "indemnification" regarding the $30,000 loan, this terminology is not altogether appropriate. The court did not anticipate an ongoing relationship between the parties, or responsibility on the part of Wright, as would have occurred with indemnification in the technical sense.[8] Rather, the court anticipated and implemented a clean break of the relationship through a lump sum payment.

In effect, the court viewed the $30,000 as Humphries' money which had been used in part for the operation of Wright's nursery. The court did not require Wright to directly pay off the note. Moreover, it only required Wright to pay to Humphries that portion of the $30,000 which Humphries had used for the nursery and for which Wright was responsible. Thus, we believe the court correctly viewed payment of the note, per se, as Humphries' obligation.[9] The operative theory, then, was more one of equitable reimbursement or accounting rather than indemnification. Accordingly, Humphries was not entitled to postjudgment interest at higher than the legal rate, or costs or attorney fees for which Humphries might eventually become responsible if he chose to forego prompt repayment of the note and his bank brought collection action.

### EXONERATION OF PRELIMINARY INJUNCTION BOND

■ In March 1986, the trial court gave possession of the nursery to Wright under an order captioned as a temporary restraining order. *But see* note 1, *supra.* Wright was required to post a preliminary injunc-

---

**8.** Had the court meant Wright to indemnify Humphries it would have awarded only that amount which Humphries had paid on the note as of the date of the judgment, perhaps accompanied with declaratory relief to the effect that Wright should continue to indemnify Humphries for any payments subsequently made. Under this scenario, the payment of postjudgment interest at the contract rate, as well as incurred attorney fees and costs, would make sense, albeit on a prospective basis only.

**9.** This view is bolstered by a discussion between counsel and the court which took place at a post-trial hearing on July 12, 1988. In that hearing the court emphasized the fact that there was no evidence Wright had participated in the loan negotiations or authorized Humphries to accept the bank's terms. Thus, although Wright was obligated to reimburse most of the amounts used for nursery purposes, Humphries was exclusively obligated on the note.

tion bond to compensate Humphries in the event that the order was wrongfully entered. *See* Utah R.Civ.P. 65A(c). Wright discharged Humphries, took possession of the nursery, and retained control of the nursery thereafter. The injunction and bond remained in effect until the trial, following which the order was specifically affirmed in the court's final judgment. After the trial on the merits, Wright moved to exonerate the injunction bond. The court denied Wright's motion, for reasons which do not appear in the record before us. We hold that it was error for the court not to exonerate the bond.

According to Rule 65A(c) of the Utah Rules of Civil Procedure, the purpose of an injunction bond is to provide "for the payment of such costs and damages as may be incurred or suffered by any party *who is found to have been wrongfully enjoined or restrained." Id.* (emphasis added). A right of action on the bond does not arise until the court dissolves the injunction or determines that the injunction should not have been granted. 42 Am.Jur.2d *Injunctions* § 380 (1969). Moreover, if it is finally determined that the injunction was proper, the purpose for the bond has been achieved and it may be exonerated. *See id.*

In a pretrial motion for summary judgment, Wright argued that Humphries had waived his right to rescind the Purchase Agreement. The court agreed and dismissed with prejudice Humphries' claim for rescission and consequently his claim for possession of the nursery. Humphries was apparently resigned to that decision—he never sought its reconsideration, did not contest it at trial, and has not appealed it—but rather pursued his remedies at law. Moreover, he has never challenged the validity of the injunction. After the trial on the merits, the court affirmed its prior orders including the injunction. Once *final* judgment was entered, the *preliminary* injunction necessarily terminated. The injunction having terminated, the court was bound to exonerate the bond upon proper motion and it erred when it refused to do so.

## WRONGFUL TERMINATION

■ In its special verdict, the jury concluded that Wright terminated Humphries as an employee contrary to the terms of the Management Agreement. It awarded Humphries $15,000. The court, however, determined that Wright was justified in terminating Humphries as a matter of law and dismissed the wrongful termination claim. Humphries argues that the court abused its discretion in dismissing this claim. We do not agree.

Following the trial and jury deliberations, the foreman read the special verdicts. The trial judge, presumably to clarify apparent conflict among the various awards, then questioned him concerning certain of the damage awards. In particular, the foreman was asked to explain the $6,805 awarded to Wright for Humphries' breach of the agreements. His response clearly indicated that the jury found Humphries had, on several occasions prior to his termination, misappropriated funds from the nursery for his own use and the award reflected those misappropriations.

It is a basic tenet of agency law that "[a] principal is privileged to discharge before the time fixed by the contract of employment an agent who has committed such a violation of duty that his conduct constitutes a material breach of contract." Restatement (Second) of Agency § 409(1) (1958). Humphries can hardly argue that misappropriation of thousands of dollars in nursery funds was anything but a material breach of the Management Agreement.

The jury foreman's more detailed responses to the effect that Humphries had misappropriated funds were inconsistent with the general conclusion that Wright had breached the agreements by terminating Humphries as an employee. Courts need to reconcile these kinds of inconsistencies. *Bennion v. LeGrand Johnson Constr. Co.,* 701 P.2d 1078, 1083 (Utah 1985). However, where the two cannot be reconciled, as in this case, the more specific finding must govern the outcome. *Cf. Knape v. Livingston Oil Co.,* 193 Kan. 278, 392 P.2d 842, 844 (1964) ("If special findings cannot be reconciled with the gen-

eral verdict and are sufficiently full and complete in themselves, and are not inconsistent in themselves, judgment must follow the special findings."); *Johnson v. Tradewell Stores, Inc.,* 24 Wash.App. 53, 600 P.2d 583, 585 (1979) ("A special finding inconsistent with the general verdict controls."). Thus, we hold that the court appropriately dismissed the wrongful termination claim since Wright had good cause, as a matter of law, to terminate Humphries.[10]

### ATTORNEY FEES

Wright challenges the award of attorney fees to Humphries as not being rationally based. The jury was instructed that "the prevailing party in this action is entitled to a reasonable attorney's fee incurred in connection herewith." Based upon this instruction, the jury awarded Humphries $10,000 in attorney fees.[11] Although we have significantly modified the judgment on appeal, Humphries still appears to be properly regarded as the party who prevailed at trial. *See generally Mountain States Broadcasting Co. v. Neale,* 783 P.2d 551, 555–57 (Utah Ct.App.1989). However, he did not hold on to all of his trial victory on appeal and some adjustment may be necessary so that he does not recover fees attributable to issues on which he did not prevail. *See id.* at 556 n. 10. On the other hand, "while not enjoying total success on this appeal," Wright is properly regarded as the party who prevailed on appeal and "is entitled on remand to an award of [his] attorney fees reasonably incurred on appeal." *Id.* at 557. *See id.* at 557 n. 11. We accordingly remand for further consideration of attorney fees and for such further proceedings and relief as may be appropriate in that regard. *See generally Halladay v. Cluff,* 739 P.2d 643, 645 n. 5 (Utah Ct.App.1987).

### CONCLUSION

Humphries failed to prove fraud against Wright and we therefore reverse the $38,-582.00 award. The trial court should have exonerated the injunction bond upon the proper motion of Wright and, thus, we remand to the trial court for appropriate relief in this respect. We also remand to the trial court for further consideration of attorney fees. As to the other issues raised on appeal, we affirm.

BENCH and BILLINGS, JJ., concur.

---

**10.** Humphries cites us to *Bennion v. LeGrand Johnson Constr. Co.,* 701 P.2d 1078 (Utah 1985), for the proposition that "[w]hen special interrogatories or verdicts are ambiguous, counsel has an obligation either to object to the filing of the verdict or to move that the cause be resubmitted to the jury for clarification." *Id.* at 1083. As counsel recognized, the purpose of this rule is to avoid "the expense and additional time for a new trial by having the jury which heard the facts clarify the ambiguity while it is able to do so." *Id.* In this case, the trial court obviated the need for this formality by recognizing the inconsistency and seeking immediate clarification from the jury.

**11.** The jury instruction regarding attorney fees was broader than the provision in the Purchase Agreement which only provided for recovery of fees to the prevailing party who was "enforcing performance of any covenant or representation hereunder or for damages for breach thereof." The instruction given allowed the jury to award fees to the party who prevailed in the action. Neither party objected to this instruction and both thereby acquiesced in the instruction as given. Nor did either party object to having the jury make the attorney fee decision, a matter ordinarily better entrusted to the court.