STATE of Utah, Plaintiff and Appellee,

v.

C. Dean LARSEN, Defendant
and Appellant.

No. 900473–CA.

Court of Appeals of Utah.

Feb. 7, 1992.

Larry R. Keller, Salt Lake City, for defendant and appellant.

R. Paul Van Dam and David B. Thompson, Salt Lake City, for plaintiff and appellee.

Before BENCH, P.J., and JACKSON and ORME, JJ.

## OPINION

BENCH, Presiding Judge:

C. Dean Larsen appeals his conviction of eighteen counts of securities fraud and theft on the ground that the Office of the Utah Attorney General (the Attorney General) should have been disqualified from the case for a conflict of interest. Larsen further asserts that formal investigation into wrongdoing was prompted by disclosure of confidential information from his attorney, and constituted an ethical violation. Larsen also challenges the admissibility of opinion testimony by the State's expert, the court's failure to prohibit certain evidence, and its refusal to give certain jury instructions. We affirm.

## I. FACTS

In the early 1970s, C. Dean Larsen, an attorney with a background in real estate that predated his law career, filed articles of incorporation for what became a real estate development company known as Granada, Inc. (Granada). Larsen served as president of Granada, a closely held corporation owned by him and members of his family. According to Larsen, Granada was "inactive" during the first few years after incorporation, but in the mid 70's began buying land for real estate development. The projects ranged from housing developments and apartments, to office buildings and a shopping center. The projects were mostly concentrated along Utah's Wasatch Front at first, but eventually they included real estate developments in Arizona and Nevada. The first fifteen or twenty projects were also very successful.

In simple terms, the capital for most of the projects was provided by Larsen's law clients, typically doctors and dentists for whom he had set up professional corporations and pension plans. These clients invested retirement and pension monies in various limited partnerships Larsen formed for real estate development. Granada served as general partner in many of the limited partnerships, and acted as manager in others when a different general partner was named. In all, close to one hundred

real estate limited partnerships were organized.[1]

Granada had no employees during the first eight years after its incorporation, but hired its first employee in 1979. More employees were hired as Granada grew. Larsen said that, with this growth, he spent more of his time with Granada, and less time with his law practice. Larsen thereupon hired Brian Farr, a recently licensed attorney.

Larsen claims he hired Farr as his own personal attorney to advise him in representing his clients, thereby creating an attorney-client relationship nested within another attorney-client relationship. Although Larsen disputes that Farr was ever an associate, except briefly, he referred several legal matters to Farr to be performed on behalf of his clients. Larsen also assigned Farr some legal work of a personal nature, such as a parking violation by an office vehicle, pro bono litigation, a land sale, and preparing amendments to an unrelated family partnership as new family members were born. Larsen further assigned Farr some Granada-related projects, such as evictions and a health plan.

Larsen supervised Farr's work throughout their working "relationship." Farr reported the hours he worked to Larsen, who then billed the clients. In turn, the clients paid Larsen, and Larsen paid Farr for his services through an account in the name of Larsen's professional corporation. The Larsen–Farr relationship lasted approximately four years.

Larsen and Farr sometimes conferred together with clients. According to Farr, during one such meeting, after setting up a professional corporation and a pension plan for a doctor and his wife, Larsen explained about certain reporting requirements that were involved. Larsen informed the clients that an accountant, a bank or a specialized pension accounting service could discharge those duties. Farr asserted that Larsen

discouraged the clients from using a bank or an accountant, but recommended that they use Professional Pension Services (PPS), an entity that Larsen said dealt exclusively with pension matters. Larsen also told the clients that if they were to use PPS, they would like its liquid mortgage fund because investments in the fund required no minimum deposit and carried no penalty for early withdrawal. It appears from the record that PPS was loaning the fund proceeds to Granada-related projects.

Farr claimed that Larsen failed, in recommending PPS, to disclose his former ownership of or continuing influence over PPS. Farr believed these omissions could put the clients' investments at risk. After the meeting, Farr contacted PPS at the request of the clients for information about the liquid mortgage fund. He learned that PPS did not have an offering statement or any agreement regarding the use of the liquid mortgage fund. Farr's concerns were further heightened when he was unable to find any recorded trust deeds securing the loans. After reviewing files at Granada and receiving additional information from PPS, Farr discovered that these problems were widespread.

Farr spoke to Larsen about what he had learned and perceived to be a problem. Larsen assured him that the matter would be resolved. Despite these assurances, nothing was done. Farr continued to press Larsen for a resolution and even volunteered to handle the matter. Larsen rejected the offer, and hired outside counsel to research any possible violations of state securities laws. As a result of the growing tension between Larsen and Farr, their work relationship was severed in 1982.[2]

Following the breakup, Farr continued to be concerned about the interests of former "clients," especially their investments in Granada. As a result of what he perceived to be ongoing securities violations, Farr

---

1. Of these entities, only the limited partnerships known as The Oaks, Ltd., Three Crowns, Baseline, and EFF Fund, Ltd., were involved in the forty-two count amended information.

2. Larsen claims that Farr's failure to make partner was the reason for the breakup as well as his motive in reporting Larsen to the Utah Securities Division, a rather telling statement in view of Larsen's claim that Farr was never even an associate in any meaningful sense.

contacted Constance White of the Utah Securities Division (Securities Division) in 1983. Farr told White what he knew about Granada based on what he had seen, was told, or had heard. White then turned the matter over to the Securities Division staff for investigation. Later, in 1986, Farr was employed by the Attorney General in the Health Division.

Concurrent with these events, Granada began to experience serious cash flow shortages and its investments suffered. Larsen claimed he believed Granada was solvent, and sought Securities Division approval for a new mortgage fund offering by Granada. In early 1987, Larsen learned that the figures he relied on were inaccurate. The Securities Division told Larsen that Granada would be placed in receivership if Granada did not petition for bankruptcy. Granada then petitioned for bankruptcy in February 1987.

On October 19, 1988, the State filed a fifty-count criminal complaint against Larsen. The complaint alleged that Larsen had committed securities fraud and related acts of dishonesty in the sale of securities. Larsen was bound over on forty-two counts following a motion to amend and a lengthy preliminary hearing. Larsen then moved to sever the trial into five parts in order to more closely align the victims, dates, transactions, and entities involved. The trial court granted the motion and Larsen went to trial on the eighteen counts of securities fraud involving EFF Fund, Ltd. (EFF Fund or EFF).

Larsen then moved to disqualify the Attorney General on the ground that Farr's subsequent employment with the State, when coupled with his previous disclosures to the Securities Division, posed a conflict of interest that should have been imputed to the entire office of the Attorney General. After a two-day hearing in which Farr, Larsen, and White testified, the district court denied the motion.

Larsen filed a written opposition to the ruling, and filed an interlocutory appeal, both of which were denied. Before trial, Larsen moved to prohibit testimony about any entities other than EFF Fund, but the motion was denied. Larsen also moved to prohibit inquiry into the investigation by the Securities Division that led to the eventual suspension of EFF. That motion was deferred until trial. After a two-week trial, a jury found Larsen guilty of all eighteen counts.

## II. DISQUALIFICATION

### A. Attorney–Client Relationship

Larsen argues that the Attorney General should have been disqualified from prosecuting the case against him because Farr's employment with the Health Division mandated disqualification under the imputed conflict of interest rule. *See* Utah Rules of Professional Conduct Rule 1.10 (1990). Larsen also contends that his conviction should be reversed because Farr's disclosures to the Securities Division violated certain ethical duties of confidentiality owed to Larsen as a former client of Farr. The threshold issue of both these arguments is whether an attorney-client relationship existed. *Cf. Williams v. Barber,* 765 P.2d 887, 889 (Utah 1988) (threshold inquiry in legal malpractice is whether an attorney-client relationship existed). The trial court found that Farr was not Larsen's attorney except for a few minor transactional matters unrelated to securities or the criminal charges against him in this case, and denied Larsen's motion to disqualify.

To prove that the trial court's findings of fact were clearly erroneous, "an appellant must marshal all evidence in favor of the facts as found by the trial court and then demonstrate that even viewing the evidence in a light most favorable to the court below, the evidence is insufficient to support the findings of fact." *Saunders v. Sharp,* 806 P.2d 198, 199–200 (Utah 1991). If an appellant fails to marshal the evidence, "the appellate court assumes that the record supports the findings of the trial court and proceeds to a review of the accuracy of the lower court's conclusions of law and the application of that law in the case." *Id.* at 199.

■ Larsen challenges several factual findings of the trial court concerning the nature or extent of their professional relationship,[3] but admits he "may have fallen somewhat short" in marshaling the evidence. Larsen even goes so far as to suggest that he was prevented from doing so because of page limitations imposed upon him.[4] Our insistence on compliance with the marshaling requirement is not a case of exalting hypertechnical adherence to form over substance. "A reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing party may dump the burden of argument and research." *State v. Bishop*, 753 P.2d 439, 450 (Utah 1988) (quoting *Williamson v. Opsahl*, 92 Ill.App.3d 1087, 1089, 48 Ill. Dec. 510, 511, 416 N.E.2d 783, 784 (1981)). The marshaling requirement provides the appellate court the basis from which to conduct a meaningful review of facts challenged on appeal. *See Wright v. Westside Nursery*, 787 P.2d 508, 512 n. 2 (Utah App.1990) (the purpose of the marshaling requirement is to spare appellate courts the onerous burden of combing through the record in search of supporting factual matters).

■ Larsen argued only "selected evidence favorable to [his] position," *Crook-*

*ston v. Fire Ins. Exch.*, 817 P.2d 789, 800 (Utah 1991), without presenting any of the evidence supporting the trial court's findings. Larsen's approach "does not begin to meet the marshaling burden [he] must carry." *Id.* Because Larsen failed to marshal evidence in support of the trial court's findings and show how they are clearly erroneous, we affirm the factual findings of the trial court that Farr was not Larsen's personal attorney, except in a few minor transactional matters unrelated to this prosecution.[5]

### B. Substantial Factual Relationship Test

■ Having affirmed the trial court's finding regarding the limited nature of the attorney-client relationship between Farr and Larsen, we review its decision to not disqualify the Attorney General. The parties agree that the applicable standard governing disqualification is set forth in Rule 1.10(b) of the Utah Rules of Professional Conduct, which provides as follows (with our emphasis):

When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in *the same or a substantially factually related matter* in which that lawyer, or firm with which the lawyer has associated, had previously

**3.** Larsen challenges the following factual findings on appeal: (1) that Farr was an associate of Larsen in the practice of law; (2) that Farr occasionally performed legal work for Larsen personally; (3) that the legal work involved minor transactions unrelated to the matters or issues pending in this prosecution; (4) that Farr did not represent Larsen while serving common clients; (5) that, if an attorney client relationship existed between Farr and Larsen, it was related only to minor transactional matters, and not to any matter substantially related to the prosecution; (6) that Farr was not general counsel for Granada; (7) that Farr performed legal work for Granada in a few minor matters; (8) that the work was unrelated to the matters and issues pending in this prosecution; and (9) that Farr's representation ceased prior to 1983.

**4.** Larsen was allowed to file an overlength brief of 81 pages after his request to file a 120–page brief was denied. The 81-page brief was supplemented by five volumes of supporting addenda that made extensive reference to memoranda of points and authorities in the briefs filed below, thereby, circumventing any size restrictions. Given this leeway, the argument that

Larsen was prevented from marshaling is somewhat disingenuous.

**5.** Larsen asserts that it was his subjective belief that Farr was his personal attorney in all things, but fails to present any evidence of conduct that would warrant an implied attorney-client relationship. *See, e.g., Margulies v. Upchurch*, 696 P.2d 1195, 1200 (Utah 1985) (an attorney-client relationship was implied where the law firm had represented a limited partnership in which the would-be clients had invested); *Breuer–Harrison, Inc. v. Combe*, 799 P.2d 716, 727–28 (Utah App.1990) (although an attorney-client relationship may be implied by the parties' conduct, a would-be client's belief that a professional relationship exists must have been reasonably induced by the attorney's conduct). *Cf. Atkinson v. IHC Hosps., Inc.*, 798 P.2d 733, 735 (Utah 1990) (courts consider who the attorney claimed to have represented as shown by the pleadings and other documents; the existence of an employment contract or retainer agreement; and the parties' admissions about the relationship).

represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter.

Whether the matters in which Farr represented Larsen were "the same or substantially factually related" to the current case is a critical factor in the disqualification calculus. The trial court found that Farr's representation of Larsen was limited to a handful of legal matters unrelated to the securities or criminal charges against him.

On appeal, Larsen offered no argument that the matters in which the trial court found Farr had represented him were the same or substantially related to the matters for which disqualification is now sought. Unless a substantial factual relationship is shown between the matters, disqualification is not required under the rule because the most basic element is not present. Our conclusion that there is no substantial relationship is supported by the fact that Farr learned of the perceived securities problems outside the scope of the legal representation of Larsen expressly undertaken. When Farr confronted Larsen about the problems, Larsen rejected Farr's offer to handle the matter and hired outside counsel.

Absent a substantial factual relationship between the former and present matters, no attorney-client relationship can be imposed on Farr with respect to this litigation, and "there could be no conflict of interest created" by Farr's subsequent employment with the Attorney General. *Margulies v. Upchurch*, 696 P.2d 1195, 1200 (Utah 1985). Accordingly, we conclude that, inasmuch as disqualification of the Attorney General was not mandated under Rule 1.10(b) of the Utah Rules of Professional Conduct, it was not an abuse of

discretion for the trial court to allow the Attorney General to remain as counsel. *Id.*

■ Further, we also reject Larsen's argument that the mere appearance of impropriety is sufficient to overturn his conviction. In *State v. Ford*, 793 P.2d 397 (Utah App.1990), this court said that a criminal defendant "is not automatically entitled to a reversal of his conviction" merely because of an apparent violation of a rule of professional conduct. *Id.* at 400. If Farr violated any ethical rules, the "appropriate remedy lies with the disciplinary arm of the Utah State Bar." *Id.*

### III. EXPERT OPINION

Larsen argues that the court erred in allowing the former registration chief of the Securities Division, an attorney now serving as a securities examiner in Nevada, to offer expert opinion testimony concerning the "materiality" of information not disclosed to investors. Larsen asserts that the opinion was improper legal testimony, not factual testimony. Whether or not the information was "material" is an element of securities fraud.[6]

■ It is within the discretion of the trial court to determine the suitability of expert testimony in a particular case, *State v. Clayton*, 646 P.2d 723, 726 (Utah 1982), and we will not reverse that determination on appeal in the "absence of a clear showing of abuse." *Lamb v. Bangart*, 525 P.2d 602, 607–08 (Utah 1974). Expert testimony is suitable if it will "assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." Utah R.Evid. 702. In general, expert testimony is suitable in securities fraud cases because the technical nature of securities is not within the knowledge of the average layman or a subject within common experience and would help the jury understand the issues before

---

6.  It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to:
    (1) employ any device, scheme, or artifice to defraud;
    (2) make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
    (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
Utah Code Ann. § 61-1-1 (1989).

them. *See Dixon v. Stewart*, 658 P.2d 591, 597 (Utah 1982).

■ Under Rule 704 of the Utah Rules of Evidence, expert opinion is "not objectionable because it embraces an ultimate issue to be decided by the trier of fact".[7] Despite the appropriateness of expert testimony on an ultimate issue, Rule 704 was not intended to allow experts to give legal conclusions. *See Davidson v. Prince*, 813 P.2d 1225, 1231 (Utah App.1991) (citing *Owen v. Kerr–McGee Corp.*, 698 F.2d 236, 240 (5th Cir.1983)).

■ The danger of allowing expert opinion couched as a legal standard is that "the jurors will turn to the expert, rather than to the judge, for guidance on the applicable law." 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence*, ¶ 704[02]. *See also First Sec. Bank v. Banberry Crossing*, 780 P.2d 1253, 1258 (Utah 1989) (legal duty owed by trust deed trustee to trustor is question of law to be determined by the court, and not question of fact suitable for testimony by expert in real estate law); *Ashton v. Ashton*, 733 P.2d 147, 153 (Utah 1987) (attorney's expert opinion as to effect of joint tenant's conveyance was inadmissible statement of law). The determination of whether expert opinion embraces an ultimate factual issue or constitutes a legal conclusion is a difficult call because "[t]here is no bright line between permissible questions under Rule 704 and those that call for overbroad legal responses." *Davidson*, 813 P.2d at 1231.[8]

The distinction between a factual evidentiary showing of materiality and impermissible opinion on the legal question of materiality was underscored in *United States v.*

*Lueben*, 812 F.2d 179, 183 (5th Cir.1987). In *Lueben*, the Fifth Circuit held that expert opinion on materiality was admissible as being fact-oriented. The court reasoned that whether certain false statements would have had "the capacity to influence" a loan officer as a factual element of the government's case was distinguishable from the question of whether the statements were legally "material." *Id.* at 184. The government was required to make an initial factual showing of materiality as an element of its case. The Fifth Circuit ruled that the district court, therefore, committed reversible error in not allowing expert testimony since the defendant would have been entitled to a directed verdict of acquittal if the government was unable to prove each element of its case. *Id.* at 185.

■ Although *Lueben* involved a prosecution for making false statements in connection with a loan application and tax returns, rather than securities violations, the case illustrates the distinction between permissible fact-oriented questions as to materiality and impermissible legal conclusions referred to in the cases cited by Larsen.[9] Accordingly, we are persuaded by *Lueben* that use of the term "material" may be admitted as permissible fact-oriented testimony. Upon review of the record, we conclude that the expert in this case used the term "material" in a factual sense.

Since the State is required to prove all essential elements of a crime, and materiality is an element of the offense charged in this case, there was no abuse of discretion in allowing the expert testimony. *See State v. Florez*, 777 P.2d 452, 456 (Utah 1989) (state has a right to introduce evi-

---

7. Black's Law Dictionary 1057 (6th ed. 1991) defines an ultimate issue as "[t]hat question which must finally be answered as, for example, the defendant's negligence is the ultimate issue in a personal injury action."

8. *See State v. Span*, 819 P.2d 329, 331–334, 332 n. 1 (Utah 1991) (arson investigator testified that fire was intentionally set); *American Concept Ins. Co. v. Lochhead*, 751 P.2d 271, 273 (Utah App.1988) (expert could submit affidavit as to ultimate issues of lack of good faith and fair dealing in suit for tortious interference with business relations). *See also Davis v. Mason County*, 927 F.2d 1473, 1484–85 (9th Cir.1991)

(police expert could testify that county sheriff was "reckless" in failing to adequately train his deputies, and that there was a causal link between this recklessness and plaintiffs's injuries); *United States v. Nixon*, 918 F.2d 895, 905 (11th Cir.1990) (police detective could use the term "conspiracy," since testimony was factual and not a legal conclusion).

9. *See United States v. Scop*, 846 F.2d 135 (2nd Cir.1988); *Adalman v. Baker, Watts & Co.*, 807 F.2d 359 (4th Cir.1986); and *Marx & Co., Inc. v. Diner's Club, Inc.*, 550 F.2d 505 (2nd Cir.1977).

dence on every element). Furthermore, any confusion that might have been created by the casual use of the term "material" and its legal definition could have been corrected with a jury instruction. *See Conger v. Tel Tech, Inc.*, 798 P.2d 279, 283 (Utah App.1990); *State v. Ortiz*, 782 P.2d 959, 962 (Utah App.1989).

## IV. MOTIONS IN LIMINE

### A. EFF Fund

Larsen brought a motion in limine to prohibit the State from introducing testimony concerning any entities other than EFF Fund on the ground that any such evidence was irrelevant to the eighteen counts of securities fraud severed for trial.[10] The State asserted that the evidence was relevant because: EFF had been set up similarly to the other entities; Larsen had told investors that EFF would be operated the same way as PPS; the claim as to similarity was an inducement for investment; and the partnerships all received money from EFF because of their structural similarity.

The State also claimed that Larsen had promised the investors that the loans were secured by promissory notes, but that these documents were only partially completed or non-existent. Although the trial court instructed the State that it could not delve into specific acts of misconduct, the court denied Larsen's motion, stating that the government was entitled to pursue its theory of the case. On appeal, Larsen claims his conviction should be reversed because of prejudicial error inasmuch as the evidence was irrelevant and immaterial.

"Relevant evidence" is defined as that "evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable" and is admissible unless excluded. Utah R.Evid. 401 and 402. *See generally State v. Gray*, 717 P.2d 1313, 1316 (Utah 1986). Rule 403 states that "relevant evidence *may be* ex-

cluded if its probative value is found to be substantially outweighed by the potential for unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Utah R.Evid. 403 (emphasis added). Thus, in determining whether relevant evidence should be excluded, "[e]vidence that tends to prove an element of the crime is admissible. Evidence which goes to general disposition or that is unfairly prejudicial is not admissible." *State v. Jamison*, 767 P.2d 134, 137 (Utah App. 1989).

■ The explanations given by the State regarding the relevance of the other entities to EFF were cogent to the legal test of relevance because they tended to make the existence of facts concerning the alleged securities violations more or less probable than without the evidence. The trial court had a legal basis, therefore, to admit the evidence. *See State v. Ramirez*, 817 P.2d 774, 781 n. 3 (1991).

■ Larsen does not challenge the merits of any of the reasons given by the State as to relevance. Larsen's claim as to relevance is based solely on the grounds that the EFF Fund, the liquid mortgage fund, and the other partnerships were separate entities. Larsen mistakenly asserts that the trial court's severance of those claims bars any discussion of those entities. The relevance of these other entities to the other charges, as the trial court pointed out, does not preclude their relevance to the EFF Fund.

Larsen also made no argument on how evidence of the other entities confused the issues or misled the jury. The trial court's cautionary instruction prohibiting the State from delving into other acts of misconduct adequately balanced the apparent concerns for unfair prejudice. The trial court, therefore, did not abuse its discretion in admitting the evidence.

---

10. In particular, Larsen objected to the State's inquiries into how Granada raised money to acquire and develop properties; how the liquid mortgage fund or its counterpart, the PPS fund, operated; how EFF money was used; what limitations were imposed on the fund; whether EFF was ever investigated; the significance of certain portions of a registration statement; and which properties received monies from EFF.

## B. Investigation by the Securities Division

■ Larsen also brought a motion in limine to prevent testimony regarding an investigation of Granada by the Securities Division, claiming that the evidence would be "highly prejudicial." Without holding a hearing or ruling on the motion, the trial court indicated in a minute entry that consideration of the matter would be deferred until trial. The testimony was later admitted at trial over Larsen's objection. On appeal, Larsen contends the testimony should have been excluded as impermissible character evidence under Rule 404 of the Utah Rules of Evidence.

> "[I]n order to preserve a contention of error in the admission of evidence for appeal, a defendant must raise a timely objection to the trial court in clear and specific terms. Where there [is] no clear or specific objection on the basis of character evidence or unfair prejudice and the specific ground for objection [is] not clear from the context of the question or the testimony, the theory cannot be raised on appeal."

*State v. Schreuder*, 726 P.2d 1215, 1222 (Utah 1986) (footnote omitted).

Although Larsen claims he objected "at every opportunity at trial," no Rule 404 character evidence objections were made. Larsen objected to the State asking questions in improper form, assuming facts not in evidence, asking for irrelevant and immaterial evidence, and asking for evidence which, although relevant, should have been excluded under Rule 403.

Larsen's objections as to form, relevance, materiality, leading nature and so on do not call the court's attention to impermissible character evidence and the theory is not clear from the context. *See State v. Eldredge*, 773 P.2d 29, 35 (Utah), *cert. denied*, 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989); *Schreuder*, 726 P.2d at 1222. Because no proper objection was made, Larsen has not preserved the issue for appeal and we do not address the issue further.

## V. REMAINING ISSUES

### A. Specific Intent

■ Larsen argues that the trial court's refusal to give his proposed jury instructions on specific intent was reversible error. Although a criminal defendant is entitled to have the jury instructed on his theory of the crime if there is any basis in the evidence to support that theory, jury instructions should not incorrectly or misleadingly state the law. *State v. Aly*, 782 P.2d 549, 550 (Utah App.1989)).

■ The common law terms "general intent" and "specific intent" have not been used in the Utah criminal code since substantive amendments in 1973. *See State v. Calamity*, 735 P.2d 39, 43 (Utah 1987). *See also* Utah Code Ann. § 76–2–102 (1990).

■ The Utah Code specifies willfulness as the culpable mental state for securities fraud. "Any person who *willfully* violates any provision of this chapter ... or *willfully* violates any rules or order under this chapter ... shall upon conviction be fined not more than $10,000 or imprisoned not more than three years, or both." Utah Code Ann. § 61–1–21 (1990) (emphasis added). The trial court, therefore, properly instructed the jury that the culpable mental state for the crime of securities fraud is "willfulness," rather than specific intent as proposed by Larsen. The court defined willfulness as follows:

> You are instructed that a person engages in conduct intentionally or with intent or willfully, with respect to the nature of his conduct or to the result of his conduct, when it is his conscious desire to engage in the conduct or cause the result.

The instruction on willfulness mirrors the statutory definition of willfulness under Utah Code Ann. § 76–2–103(1) (1990). Moreover, because "willfully" is alternatively listed with "intentionally" or "with intent," the instruction is not inconsistent with *State v. Facer*, 552 P.2d 110, 111 (Utah 1976) (crime of securities fraud does not require element of loss and causal connection, since the crime is complete under

section 61–1–1(1) if defendant intentionally employs any device, scheme or artifice to defraud). Inasmuch as willfulness is the culpable mental state, a separate instruction on specific intent was unnecessary.

### B. Other Jury Instructions and Leading Questions

We have also reviewed the remaining issues raised on appeal and deem them to be without merit. In our discretion, we do not address them further. *See State v. Carter*, 776 P.2d 886, 888 (Utah 1989).

### VI. CONCLUSION

Farr's subsequent employment with the Attorney General did not mandate disqualification because there was no attorney-client relationship between him and Larsen that would have created a conflict of interest. Expert opinion on the issue of materiality was admissible as fact-oriented testimony concerning an element of the government's prima facie case. The trial court did not abuse its discretion in admitting evidence of entities other than EFF Fund because of their relevance to the issues of securities fraud. Larsen did not object to the character evidence complained of, and thereby failed to preserve the issue for appeal. The culpable mental state of securities fraud is willfulness and the trial court's instruction on the element was proper.

Accordingly, Larsen's conviction and sentence are affirmed.

JACKSON, J., concurs.

ORME, J., concurs in parts II(A), IV(B), V(A), and V(B), and otherwise concurs only in the result.