**John H. KLAS, Plaintiff and Appellant,**

v.

**Mark O. VAN WAGONER and Kathryn Van Wagoner, Defendants and Appellees.**

No. 900493–CA.

Court of Appeals of Utah.

March 27, 1992.

---

**136**

Brant H. Wall (argued), Cory R. Wall, Wall & Wall, a.p.c., Salt Lake City, for plaintiff and appellant.

Lewis T. Stevens (argued), Alexander H. Walker III, Kristin G. Brewer, Salt Lake City, for defendants and appellees.

Before BILLINGS, ORME and RUSSON, JJ.

## OPINION

ORME, Judge:

Plaintiff, John H. Klas, appeals from the trial court's ruling entitling defendants to rescission of an Earnest Money Sales Agreement, challenging the trial court's determination that the defendants made a unilateral mistake. Defendants also seek clarification on the issue of damages and attorney fees on appeal. We reverse and remand for further proceedings.

## FACTS

This matter was tried to the court on May 9, 10, and 12 of 1989. The court thereafter rendered its Memorandum Decision concluding that defendants had breached the Earnest Money Sales Agreement and that plaintiff was entitled to damages, interest, costs, and attorney fees. After a period of almost one year of objections, motions for new trial, and conflicting proposals for findings, conclusions, and judgment by both sides, the trial court entered a judgment allowing defendants to rescind the subject agreement on the basis of unilateral mistake by the defendants.[1]

---

**1.** There followed additional objections to the Findings, Conclusions and Judgment, together with motions to amend the same. On May 31, 1990, the court entered its Amended Findings of Fact and Conclusions of Law which clarified factual issues, but resulted in the same legal conclusion as the March 13, 1990 Judgment.

Inasmuch as there is no serious dispute concerning the findings of fact, the essential facts are taken from the lower court's findings.

In July of 1987, defendants, Mark O. Van Wagoner and his wife, Kathryn Van Wagoner, attended an "open house" held by Carol Klas, the former wife of plaintiff, John Klas. Carol Klas had undertaken to sell the subject property, which was owned by plaintiff pursuant to a Divorce Decree that awarded the property to plaintiff as his sole and separate property. The Divorce Decree provided that if, prior to September 1, 1987, Carol Klas could find a buyer willing to purchase the property at a price and upon terms acceptable to plaintiff, she would receive a finder's fee of 3% of the gross sale price. Following the open house, defendants expressed interest in purchasing the property.

In August of 1987, Mark Van Wagoner, who is an attorney, prepared and delivered to Carol Klas an Earnest Money Sales Agreement (the Agreement) wherein defendants offered to purchase the property for $175,000. The Agreement included an integration clause and specified that the offer was subject to no contingencies, exceptions, or conditions of sale other than what was set forth in the Agreement.[2] Carol then presented the offer to plaintiff.

Upon receiving the Agreement, plaintiff reviewed the written proposal with his attorney. Plaintiff's attorney then telephoned Mark Van Wagoner to review the document. At this time the parties discussed and made modifications to the Agreement. Plaintiff then executed the Agreement and delivered it to Mark's office. Defendants signed the document on August 11, 1987, and the parties agreed to a September closing date.

Prior to the August 1987 signing of the Agreement, defendants inquired of Carol Klas about appraisals of the property. Carol expressed to defendants her understanding that several "appraisals" had been made and that they ranged from $170,000 to $192,000.[3] The trial court found that there was an apparent misunderstanding between defendants and Carol regarding the term "appraisals." While defendants understood the term to mean formal, written appraisals, Carol's testimony indicates that she considered any opinion, whether verbal or written, given as to the value of the property to be an "appraisal." The appraisals to which Carol referred later proved to be informal opinions as to the market value of the property solicited by plaintiff from several personal acquaintances in the real estate business. One of these was in letter form; the others were merely verbal.

At no time prior to their signing the Agreement did defendants request that plaintiff produce written appraisals of the property, although, as indicated, they mistakenly assumed the "appraisals" referred to by Carol Klas were formal, written appraisals.[4] Only after signing the Agreement did defendants affirmatively demand copies of the appraisals to which Carol had referred. Plaintiff was at first unresponsive, but after learning that an appraiser engaged by defendants' prospective lender had valued the property at $137,000, plaintiff provided defendant with a copy of

---

**2.** A provision conditioning the contract upon buyers' obtaining financing was expressly deleted.

**3.** Plaintiff questions the trial court's finding that the three appraisals to which Carol Klas referred ranged from $175,000 to $192,000. It is clear from the record that both Carol Klas and Mark Van Wagoner understood the range of those appraisals to begin at $170,000, not $175,-000. Thus, we conclude that the trial court's finding that the three appraisals ranged from $175,000 and up was clearly erroneous. *Bell v. Elder,* 782 P.2d 545, 547 (Utah App.1989).

**4.** "Appraisal" may have a different, more precise connotation in contemporary real estate parlance. However, Carol Klas was not a real estate agent or broker. In general usage, appraisal means "an act of estimating or evaluating ... esp[ecially] by someone fitted to judge"; "a valuation of property by the estimate of an authorized person." Webster's Third New Int'l Dictionary 105 (1986). The three "appraisals" Carol had in mind were estimates furnished by Larry Payne, Howard Badger, and Vic Ayers, all of whom were in the real estate or mortgage lending business.

a fourth "appraisal," and the only formal written appraisal, prepared for plaintiff.

That appraisal, prepared by Devere Kent, valued the property at $165,000 but was older than the other "appraisals" referred to by Carol Klas. It had been prepared earlier in connection with a loan application made by plaintiff, prior to the divorce and plaintiff's decision to sell. Throughout the course of negotiations with Carol Klas, defendants were unaware of the existence of this appraisal, and believed that the lowest appraisal referred to by Carol was the lowest existing appraisal of the property.

In early October of 1987 defendants, through their counsel, notified plaintiff of the withdrawal of their offer to purchase the property and demanded the return of the earnest money deposit. Plaintiff then notified defendants that if they failed to consummate the purchase of the property within ten days, the property would be placed on the market in an effort to mitigate damages and that defendants would be responsible for any damages sustained. Defendants failed to finalize the purchase of the property, and plaintiff thereafter placed the property on the market. The property was sold in April of 1988, for $160,000, and plaintiff sued defendants to recover the difference between the Agreement price and the fair market value.

At trial, defendants based their refusal to consummate the purchase of the subject property upon the fact that, if known, the Kent appraisal would have made a material difference in their offer to buy the subject property. Defendants claimed this was a unilateral mistake on their part entitling them to rescission of the Agreement. Eventually, the trial court agreed with defendants, and concluded that the unilateral mistake provided a basis for rescission of the Agreement. Accordingly, the court held that no damages were recoverable by plaintiff, and dismissed plaintiff's complaint. The court also dismissed defendants' counterclaim requesting relief on the

grounds of fraud, mutual mistake of fact, and detrimental reliance.[5] Plaintiff appealed, challenging the trial court's application of the law in permitting rescission of the Agreement on the basis of unilateral mistake.

## STANDARD OF REVIEW

Essentially, plaintiff does not dispute the trial court's findings of fact, but challenges the trial court's application of the doctrine of unilateral mistake. The issue before us, then, is whether the trial court erred in its legal conclusion that defendants were entitled to rescission of the Agreement on the basis of unilateral mistake. "If a trial court interprets a contract as a matter of law, we accord its construction no particular weight, reviewing its action under a correctness standard." *Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985). *Accord 50 West Broadway Assocs. v. Redevelopment Agency of Salt Lake City*, 784 P.2d 1162, 1171 (Utah 1989); *Copper State Leasing Co. v. Blacker Appliance & Furn. Co.*, 770 P.2d 88, 90 (Utah 1988). Moreover, the trial court's legal conclusions "are accorded no particular deference; we review them for correctness." *Bellon v. Malnar*, 808 P.2d 1089, 1092 (Utah 1991) (quoting *Grayson Roper Ltd. Partnership v. Finlinson*, 782 P.2d 467, 470 (Utah 1989)).

## UNILATERAL MISTAKE

■ This court has identified four criteria that must be satisfied before rescission on the basis of unilateral mistake will be permitted:

1. The mistake must be of so grave a consequence that to enforce the contract as actually made would be unconscionable.

2. The matter as to which the mistake was made must relate to a material feature of the contract.

3. Generally the mistake must have occurred notwithstanding the exercise of

---

5. Defendants sought an award of punitive damages, costs, and attorney fees on their claims for fraud and detrimental reliance, and sought cancellation or rescission of the Agreement as relief on their claim for mutual mistake.

ordinary diligence by the party making the mistake.

4. It must be possible to give relief by way of rescission without serious prejudice to the other party except the loss of his bargain. In other words, it must be possible to put him in status quo.

*Grahn v. Gregory,* 800 P.2d 320, 327 (Utah App.1990). *See generally Guardian State Bank v. Stangl,* 778 P.2d 1, 4–5 (Utah 1989) (discussing evolution of doctrine of unilateral mistake). In applying these factors to the trial court's findings of fact, we conclude that at least two of the four elements required to sustain the trial court's rescission of the Agreement have not been met.

### A. Unconscionability

First, we are not convinced that the alleged mistake was so grave as to render enforcement of the Agreement as made unconscionable. Concerning unconscionability, the Utah Supreme Court has stated that "a duly executed written contract should be overturned only by clear and convincing evidence." *Resource Management Co. v. Weston Ranch and Livestock Co.,* 706 P.2d 1028, 1043 (Utah 1985). In determining unconscionability, "a court must assess the circumstances of each particular case in light of the twofold purpose of the doctrine, prevention of oppression and of unfair surprise." *Id.* at 1041. Courts analyze unconscionability in terms of "procedural" and "substantive" unconscionability. *Id.*

Procedural unconscionability focuses on the "relative positions of the parties and the circumstances surrounding the execution of the contract." *Jones v. Johnson,* 761 P.2d 37, 39 (Utah App.1988) (quoting *Bekins Bar V Ranch v. Huth,* 664 P.2d 455, 461 (Utah 1983)). Procedural unconscionability occurs "where there is an absence of meaningful choice and where lack of education or sophistication results in no opportunity to understand the terms of the agreement." *Johnson,* 761 P.2d at 39. Substantive unconscionability occurs when

contract terms are "so lopsided as to unfairly oppress or surprise an innocent party," *id.* at 40, or where there is "an overall imbalance in rights and responsibilities imposed by the contract, excessive price or a significant cost-price disparity, or terms which are inconsistent with accepted mores of commercial practice." *Id.*

In the instant case, defendants' alleged mistake as to the value of the property did not result from any procedural unconscionability. The trial court's findings show that the parties dealt at arms length. Defendant Mark Van Wagoner, an attorney, testified at trial that he was experienced in real estate transactions and that he had participated in many closing transactions with real estate agents.[6] Prior to signing the Agreement, defendants engaged in discussions with Carol Klas regarding the value of the home, fully aware that she was financially interested in effecting a sale. Defendants were informed by Carol that plaintiff would only accept an offer within the range of the three appraisals to which she had referred—from $170,000 to $192,000—and only if there were no exceptions, contingencies, or conditions attached thereto. Defendants assented to those terms, and tendered a form of agreement of their own choosing. It is apparent that both parties were essentially in equal bargaining positions, and that the circumstances surrounding the execution of the Agreement were not oppressive. Thus, any surprise on defendants' part was not unfair.

Similarly, the terms of the Agreement were not "so lopsided as to unfairly oppress or surprise an innocent party." *Id.* The Utah Supreme Court has stated that

> sellers and buyers should be able to contract on their own terms without the indulgence of paternalism by the courts in the alleviation of one side or another from the effects of a poor bargain. They should be permitted to enter into contracts that may actually be unreasonable or which may lead to hardship on one side.

---

**6.** There was also testimony presented at trial that Mark had previously owned a home in the neighborhood where the subject property is located, and that he lived there until 1985.

*Park Valley Corp. v. Bagley,* 635 P.2d 65, 67 (Utah 1981). In the instant case, both parties bargained for and clearly understood the terms of the Agreement. Prior to preparing the Agreement, defendants were advised by Carol Klas that plaintiff would not approve of any exceptions or conditions to the Agreement, nor any offer lower than the range of appraisals referred to by Carol. The Agreement signed by both parties contained a notation that no special considerations or contingencies existed relative to the written Agreement. Accordingly, there was no provision in the Agreement conditioning the purchase upon production of any written appraisals by plaintiff or of the property appraising at any particular value. The parties freely bargained for these terms and assented to them by executing the Agreement.

The Agreement's price of $175,000 fell within the range of informal appraisals valuing the subject property from $170,000 to $192,000. The record indicates that plaintiff relied on a variety of factors, including the three informal appraisals, to determine the value of his property. These factors formed the basis for his asking price, as well as his acceptance of defendants' offer. Under the rationale stated in *Bagley,* plaintiff was entitled to formulate the sales price of his home in the manner of his choice, just as defendants were entitled to base their offer on their own opinion of the value of the property. Because defendants, after arm's-length negotiations with plaintiff, agreed to purchase the property for a price within the range set by plaintiff, we conclude that defendants' ignorance of the existence of the Kent appraisal valuing the property at $165,000 would not render enforcement of the Agreement unconscionable.

In addition, we conclude that, even considering the Kent appraisal, the sales price was not itself unconscionable. First, the $10,000 difference between the Kent appraisal, valuing the property at $165,000, and defendants' offer of $175,000 can hard-ly be termed "grave" or "unconsciona-ble." [7] Second, the trial court specifically found that defendants considered their offering price of $175,000 to be reasonable. Third, despite its conclusion that rescission was proper on the basis of unilateral mistake, the trial court made no finding suggesting that the difference between the sale price and the Kent appraisal constituted grave circumstances such that enforcement of the Agreement would be unconscionable. Finally, we note that defendants have cited no authority, nor set forth a persuasive argument, to support their conclusion that the difference between the sale price and the Kent appraisal constituted grave circumstances sufficient to render enforcement of the Agreement unconscionable. For these reasons, we conclude that the consequence of defendants' alleged mistake was not so grave as to render enforcement of the Agreement unconscionable.

### B. Buyer's Diligence

Jumping to the third element necessary to sustain rescission on the ground of unilateral mistake, we find that defendants' conduct did not rise to the level of ordinary diligence required to rescind a contract on the basis of unilateral mistake. In the course of negotiations between the parties prior to signing the Agreement, defendants were aware of the existence of three "appraisals" valuing the subject property. While defendants did not know that these "appraisals" were only informal expressions of opinion, they did know that plaintiff would not entertain an offer below the lowest of the quoted figures. However, the trial court found that during these negotiations, defendants made no attempt to secure an independent appraisal on the subject property. Defendants contend that their reliance on Carol Klas's representations as to the three alleged appraisals excused their failure to obtain additional appraisals of the subject property prior to executing the Agreement. Specifically, defendants contend, and the trial court found,

---

7. In light of our conclusion that both parties understood the appraisals to range from $170,-000 and up, we likewise do not consider the $5,000 difference between the Kent appraisal and the lowest of the three informal appraisals to be an unconscionable difference.

that defendants' mistaken belief that the lowest existing appraisal on the property was $170,000 was caused by Carol Klas's representations and failure to have the Kent appraisal provided in a timely manner. We are not persuaded.

Defendants had ample opportunity, if materially concerned about the value at which the property would appraise, to have the property appraised during the two-week time period between the time of their initial inspection of the property and the time they executed the agreement. The record indicates that, during this two-week period, defendants saw fit to have architects, decorators, and electricians examine the property. Yet, they did not engage an appraiser to assess the value of the home until they attempted to obtain financing after executing the Agreement. Furthermore, we find it unreasonable, especially given Mark Van Wagoner's professional training and experience in real estate law, for defendants to have failed to obtain an independent appraisal prior to executing the Agreement, or to have conditioned the obligation to purchase on the property appraising at a particular level, *if* they were truly concerned about the property's appraised value. Because defendants failed to conduct a reasonable investigation of the subject property's market value prior to executing the Agreement, defendants' conduct did not rise to the level of ordinary diligence required to establish unilateral mistake.

■ Accordingly, because defendants failed to fulfill two of the four elements necessary to justify rescission on the basis of unilateral mistake, the trial court erred in concluding that defendants were entitled to rescission of the Earnest Money Sales Agreement on the basis of unilateral mistake.[8] *See, e.g., John Call Engineering v. Manti City Corp.*, 743 P.2d 1205, 1209–10 (Utah 1987) (absent showing that enforcement of sewer construction project contract would be unconscionable, that city had exercised due care in executing contract, and that rescission of contract would not seriously prejudice engineer, contract would not be rescinded on grounds of unilateral mistake); *Davis v. Mulholland*, 25 Utah 2d 56, 475 P.2d 834, 835 (1970) (remedy of rescission on basis of unilateral mistake improper where any mistake on plaintiff's part was due entirely to plaintiff's own negligence).[9]

Accordingly, we hold that the parties executed a valid contract, influenced by no legally cognizable unilateral mistake on the part of defendants. This agreement bound defendants to purchase the subject property, with "no exceptions." In refusing to consummate the sale, defendants materially breached the Agreement, thereby entitling plaintiff to recover damages.

## PLAINTIFF'S DAMAGES

■ In its final judgment, the trial court did not address the issue of damages be-

---

**8.** Not every unilateral mistake entitles the buyer to relief. We note that even if defendants' misunderstanding of Carol Klas's representations did amount to unilateral mistake, the facts suggest that defendants bore the risk of mistake as to the value of the subject property. Restatement (Second) of Contracts § 154 (1981) explains that a party bears the risk of mistake when "(a) the risk is allocated to him by agreement of the parties, or (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient." Defendants were aware, upon entering into the Agreement, that they had only "limited knowledge" with respect to the value of the home.

**9.** In light of our determination that defendants' conduct did not rise to the level of ordinary diligence, it follows that the trial court correctly dismissed defendants' counterclaim for fraud and misrepresentation. "Fraud as related to purchase of real estate may not be predicated on alleged false statements the truth of which could have been ascertained with reasonable diligence by the party asserting their falsity." *Sokolosky v. Tulsa Orthopaedic, Inc. Pension Trust*, 566 P.2d 429, 431 (Okl.1977) (quoting *Onstott v. Osborne*, 417 P.2d 291, 293 (Okl. 1966)). Defendants could have ascertained with reasonable diligence the truth or falsity of Carol Klas's alleged misrepresentations by requesting copies of the appraisals, or demanding to know the basis for her information, or by obtaining an independent appraisal of the subject property prior to executing the agreement. Since the means of knowledge were available to defendants and since they failed to avail themselves of these means, they cannot now claim to have been deceived by the representations of the vendor. *See Sokolosky*, 566 P.2d at 431.

cause of its ruling based on unilateral mistake. In the trial court's Memorandum Decision of May 30, 1989, however, the court ruled that plaintiff's damages should be limited to $7,500. However, the trial court did not specify how it arrived at this figure. "The measure of damages for breach of contract for the conveyance of land is the difference between the contract price and the market value at the time of the breach." *Terry v. Panek*, 631 P.2d 896, 897 (Utah 1981). *See* D. Dobbs, *Handbook on the Law of Remedies* § 12.11 at 853 (1973).

In the instant case, defendants offered to pay $175,000 for the subject property in August of 1987. When defendants failed to consummate the purchase of the property, plaintiff placed the property for sale on the open market, and on April 13, 1988, sold the property for $160,000, a figure well above the value stated in defendants' appraisal. The trial court found that $160,-000 was the "highest and best price available in the market place" at the time of the sale. However, the trial court's findings do not specifically address whether this price represented the market value of the property at the time defendants breached the Earnest Money Sales Agreement, which was some seven months prior to the sale. The trial court made no finding as to the market value of the property at the time of defendants' breach. Plaintiff is entitled to recover the difference between the contract price and the market value of the property at the time of the breach.

## ATTORNEY FEES

In its first Memorandum Decision of May 30, 1989, the trial court concluded that defendants breached the Earnest Money Sales Agreement, and that plaintiff was entitled to damages and interest, costs, and attorney fees. In August of 1989, the parties entered a Stipulation allowing the court to assess attorney fees in the sum of $6,250 against defendants "should the trial court's award of attorney's fees be sustained or otherwise upheld on appeal." However, after a period of almost one year of objections, motions for new trial, and new proposed Findings, Conclusions and Judgment by both sides, the trial court entered its Amended Judgment of July 3, 1990, allowing defendants to rescind the Earnest Money Sales Agreement on the basis of unilateral mistake. Accordingly, in its July 3, 1990 Amended Judgment, the trial court awarded no attorney fees. We reverse the lower court's final Amended Judgment on the issue of unilateral mistake. We conclude, as did the trial court in its first Memorandum Decision, that defendants breached the Earnest Money Sales Agreement. Plaintiff is therefore entitled to attorney fees as specified in the stipulation as well as reasonable attorney fees incurred on appeal. *See e.g., Management Servs. Corp. v. Development Assoc.*, 617 P.2d 406, 408–09 (Utah 1980).

## CONCLUSION

The trial court's judgment allowing defendants to rescind the Earnest Money Sales Agreement on the basis of unilateral mistake is reversed. We remand to the trial court with instructions to enter judgment in favor of plaintiff, to fix appropriate damages, and to award plaintiff attorney fees consistent with this decision.

BILLINGS and RUSSON, JJ., concur.