**Loyce SCHUHMAN; Theodore Newman; and Evelyn Newman, Plaintiffs and Appellees,**

v.

**GREEN RIVER MOTEL, a partnership; Gerald K. Strong; and W.B. Woodruff, Defendants, Third–Party Plaintiffs and Appellants,**

v.

**CENTRAL UTAH TITLE, INC., a Utah corporation, Third–Party Defendant and Appellee.**

No. 910367–CA.

Court of Appeals of Utah.

July 31, 1992.

Rehearing Denied Aug. 31, 1992.

Ralph J. Marsh (argued), Backman, Clark & Marsh, Salt Lake City, for appellants.

Paul R. Frischknecht, Manti, (argued), for appellees, Loyce Schuhman, Theodore and Evelyn Newman.

Clark R. Nielsen (argued), Henroid, Henroid & Nielsen, Salt Lake City and Ross Blackham, Ephraim, for Central Utah Title.

Before GREENWOOD, JACKSON and RUSSON, JJ.

RUSSON, Judge:

Green River Motel (Green River) appeals a judgment granting rescission of a contract between Green River and Theodore and Evelyn Newman due to a fraudulent misrepresentation by Green River. It also challenges the district court's finding that escrow was not "closed" as to require Central Utah Title, Inc. to disburse the sale proceeds to Green River. We affirm.

## I. FACTS

On August 2, 1989, Loyce Schuhman, acting as agent for Theodore and Evelyn Newman, went to the office of Unitee Realty for the purpose of executing an earnest money agreement for the purchase of lots eight through fourteen of Pleasant Creek Estates located in Sanpete County, Utah (the property). The sellers were Gerald Strong and W.B. Woodruff, partners in Green River. Prior to Mrs. Schuhman signing the earnest money agreement, Mr. Ruiz, a realtor for Unitee, showed her a plat of the property, which was marked with a square and the word "hydro" on the northeast corner of lot nine. When Mrs. Schuhman inquired about the marking, Mr. Ruiz explained that the square designated the parcel that Mount Pleasant City proposed to purchase for the construction of a hydro-electric power plant. Mrs. Schuhman replied that because the Newmans were purchasing the property for its surroundings, they would not be interested in purchasing it if a power plant was planned for that property. Accordingly, Mr. Ruiz, in the presence of Mrs. Schuhman, telephoned Mr. Strong to inquire whether Mount Pleasant City intended to construct a hydro-electric power plant on the property. Mr. Strong responded that no power plant would be constructed on the property. Consequently, Mrs. Schuhman executed the agreement and paid $500 in earnest money.

On September 8, 1989, Mr. Strong and Mr. Woodruff went to Central Utah Title and executed a warranty deed on behalf of Green River which conveyed the property to the Newmans. They also signed a closing statement and an escrow instructions agreement. The following day, the Newmans went to Central Utah Title and signed the appropriate documents. Additionally, the Newmans paid, by cashier's check, the remaining balance of $65,500, in addition to their share of the closing costs.

Following the sale of the property, a Mount Pleasant City administrator informed Mrs. Schuhman that the city had plans to construct a power plant on a portion of the property that was purchased by the Newmans or in that vicinity. Mrs. Schuhman immediately notified the Newmans of this information, and on September 11, 1989, the Newmans instructed the title company not to disburse the funds due to the alleged misrepresentation by Mr. Strong.

Subsequently, the Newmans notified Green River of their intention to rescind the purchase agreement, citing Mr. Strong's alleged misrepresentation. The Newmans demanded a refund of the purchase price of $66,000 plus $3,000 in damages. However, Green River refused to order the refund of the monies.

On March 26, 1990, Mrs. Schuhman and the Newmans filed a complaint with the district court, seeking rescission of the sales contract, return of the purchase price and punitive damages. Green River filed a counterclaim, demanding specific performance or damages, as well as a third party complaint against Central Utah Title for specific performance of the escrow agreement or damages for breach of that agreement.

At trial, the district court ruled that Green River knowingly made a factual misrepresentation that no power plant would be constructed on the property, and that such caused the Newmans to enter into the earnest money agreement. The court, therefore, entered judgment in favor of the Newmans, rescinding the sales contract and ordering the return of the purchase money. The court also dismissed Green River's counterclaim.

Green River appeals that ruling, claiming that the district court erred (1) in granting rescission of the contract between the Newmans and Green River because of Mr. Strong's alleged misrepresentation that a hydro-electric plant would not be built on the property, and (2) in finding that escrow was not "closed" as to require Central Utah Title to disburse the seller's proceeds. Additionally, Central Utah Title seeks attorney fees on appeal.

## II. MISREPRESENTATION

■ Green River argues that the trial court erred in ruling that the Newmans were entitled to rescission, asserting that Mrs. Schuhman and the Newmans failed to establish all the elements of fraudulent misrepresentation. Mrs. Schuhman and the Newmans claim that the elements of fraudulent misrepresentation were established at trial, and therefore, the trial court properly granted rescission of the purchase agreement and ordered return of the purchase monies. We agree.

At trial, the burden was upon Mrs. Schuhman and the Newmans to prove fraudulent misrepresentation by clear and convincing evidence. Having prevailed at trial, "we review the evidence in the light most favorable to them, and, unless in so doing we must say as a matter of law that the evidence fails to meet the test of being clear and convincing, the findings and judgment of the court must be affirmed." *Pace v. Parrish*, 122 Utah 141, 247 P.2d 273, 274 (1952).

The court in *Pace* set forth the essential elements of fraudulent misrepresentation:

(1) That a representation was made; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.

*Id.* 247 P.2d at 274–75 (citations omitted); *accord Wright v. Westside Nursery*, 787 P.2d 508, 512 (Utah App.1990).

We first decide whether Green River made a representation concerning a presently existing material fact. At trial, Mrs. Schuhman testified that when she and Mr. Ruiz, the realtor, telephoned Mr. Strong to inquire whether the hydro-electric power plant was going to be constructed on the property, Mr. Strong responded that the plant "had been abandoned." Further, Mr. Ruiz made a memorandum of that same conversation, which was admitted at trial, and indicated that Mr. Strong stated "no power plant." Accordingly, the evidence supports the trial court's finding that Mr. Strong, in response to Mrs. Schuhman's inquiry, represented that no power plant would be built on the property.

Mr. Strong's representation also concerned a presently existing material fact. The undisputed evidence at trial was that the sole purpose for the telephone call to Mr. Strong was to determine whether the plant would be constructed on the marked parcel in order to enable Mrs. Schuhman to decide whether to execute the earnest money agreement. Therefore, Mr. Strong's response that the plant would not be con-

structed on the property was the impetus for her signing the agreement, and was plainly material.

As to whether Mr. Strong's representation concerning the power plant was false, Green River contends that the evidence does not establish the falsity of that representation. We disagree. Mrs. Schuhman, in recounting a conversation she had with Vern Fisher, a Mount Pleasant City administrator, following the sale of the property, testified that Mr. Fisher informed her that, according to certain documents, the power plant continued to be a reality on "that specific site." Moreover, the testimony of Alden Robinson, an engineer hired by Mount Pleasant City to determine the feasibility of the hydro-electric project, demonstrates that the property was, at all times relevant hereto, the proposed site for the hydro-electric plant. Mr. Robinson testified that he approached Mr. Strong at some point in 1988 to discuss the prospects of locating the hydro-electric plant on lot nine of Pleasant Creek Estates. Further, Mr. Robinson, as well as Mr. Strong, testified to ongoing communications concerning the city's plans to locate the project on the property following that initial meeting. In none of those conversations did Mr. Robinson ever indicate that the power plant would not be constructed. Upon cross-examination by the Newman's attorney, Mr. Frischknecht, Mr. Robinson testified:

FRISCHKNECHT: And in any of those conversations that you referred to, Alden, did you ever tell Mr. Strong or Mr. Woodruff that the hydro project was not going to come to fruition?
ROBINSON: No

. . . .

FRISCHKNECHT: In those conversations did you indicate in any way, either to Mr. Strong or Mr. Woodruff, that the hydro project would be a reality?
ROBINSON: I don't know that I would have said it as specifically as that. After 1989, when the funding was approved, that's how I expressed it. It's a reality because of this fact, the money is there, the bottom line had come through. But I

basically just gave him a status report where the project was, and the city was working, and you know, putting it together.

Moreover, Mr. Robinson testified that lot nine was the proposed site for the hydro-electric plant until some time in 1990, long after the sale of the property, at which time Mount Pleasant City approached Mr. Robinson and inquired whether the plant could be relocated on lot eight of the property to "accommodate the Newmans and the sale." Mr. Robinson testified that after agreeing to relocate the plant, lot eight of the property remained the proposed site "up until a couple of weeks [prior to trial] when the negotiation for actual purchase of the land was started." Accordingly, the evidence clearly demonstrates that, beginning in 1988, the property was always the proposed site of the power plant. Therefore, Mr. Strong's unequivocal representation that the power plant would not be constructed on the property was false.

Green River also argues that there was insufficient evidence at trial to prove that Mr. Strong knew that his representation concerning the power plant was false. However, in so arguing, Green River ignores Mr. Robinson's testimony. Mr. Robinson testified that he approached Mr. Strong in 1988 to discuss the city's proposal to locate the hydro-electric power plant on lot nine of the property. He further testified that in all his subsequent conversations with Mr. Strong concerning the city's plans to locate the power plant on the property, at no time did he communicate to Mr. Strong that the power plant would not be constructed. Thus, Mr. Strong had no basis for believing that the property was no longer the planned site for the hydro-electric plant. Accordingly, viewing the evidence in the light most favorable to Mrs. Schuhman and the Newmans, *Pace*, 247 P.2d at 274, the evidence supports the district court's finding that Mr. Strong knew that his representation that the plant would not be constructed on the property was false.[1]

1. The dissent claims that Mr. Strong's testimony     regarding a pre-sale conversation between him-

Furthermore, the purpose for which Mr. Strong made the misrepresentation concerning the power plant was to encourage Mrs. Schuhman to act upon the representation and execute the earnest money agreement for the purchase of the lots. It was established at trial that the sole reason for the telephone call to Mr. Strong was to inquire, prior to Mrs. Schuhman's execution of the agreement, as to whether the power project would be constructed on the property. Further, Mr. Strong acknowledged in his testimony that Mr. Ruiz informed him that Mrs. Schuhman was on the speaker phone in the realty office and was concerned with the prospects of the city locating the power plant on lot nine. Based on that evidence, it is abundantly clear that Mr. Strong made the misrepresentation for the purpose of inducing Mrs. Schuhman to act upon it.

Green River further contends that Mrs. Schuhman and the Newmans could not reasonably rely on Mr. Strong's representation that the power plant would not be constructed on the property, but had a duty to inquire and investigate further. It cites *Klas v. Van Wagoner*, 829 P.2d 135 (Utah App.1992), for the proposition that a claim of fraud, as it relates to the purchase of real estate, may not be based on alleged false statements the truth of which could have been ascertained with reasonable diligence by the party asserting their falsity. *Id.* at 141 n. 9. However, the Utah Supreme Court, in *Pace*, stated:

> Defendants suggest that the plaintiffs had no right to rely on the representations made by defendant, but were bound to make more careful and complete inquiry concerning such matters. It is strange and inconsistent for defendants to urge the necessity for the plaintiffs to cross-examine Mr. Parrish and to doubt and verify his representations.
>
> As to reliance in such situations, *see* 5 *Williston on Contracts*, Rev.Ed., Sec. 1512. The full measure of the plaintiffs' duty was to use reasonable care and observation in connection with these representations. Having done so, it does not lie in defendant's mouth to say that they were too gullible and shouldn't have believed him. The facts as found by the jury satisfy the requisites for recovery on the basis of fraudulent misrepresentation as hereinabove set out.

*Pace*, 247 P.2d at 276–77.

Since it is abundantly clear that this court is without power to overrule a decision of the Utah Supreme Court, *see State v. Hoff*, 814 P.2d 1119, 1123 n. 2 (Utah 1991), we reject any reading of *Klas* that is inconsistent with the language of *Pace*. Under *Pace*, we conclude that Mrs. Schuhman, by contacting Mr. Strong, the owner of the property, and inquiring whether the plant would be constructed thereon, exercised reasonable care under the circumstances. Mr. Strong's unequivocal representation that the power plant would not be built on the property was the *sine qua non* which dispensed with any further inquiry. Accordingly, we conclude that Mrs. Schuhman and the Newmans justifiably relied on Mr. Strong's representation.

Further, it is uncontroverted that Mrs. Schuhman acted upon Mr. Strong's representation. After receiving assurances that the hydro-electric plant would not be con-

---

self and Mr. Robinson, wherein Mr. Robinson allegedly told Mr. Strong that if Strong was able to sell lot nine, he should do so and the city would relocate the plant on an alternative site, demonstrates that Mr. Strong did not make a knowing misrepresentation. However, this argument misses the point. In order to prove that Mr. Strong knew that his representation that the plant would not be constructed on the property was false, Mrs. Schuhman and the Newmans did not have to prove that he knew for certain that it *would* be built on the property, only that it *might*. When, armed with this knowledge, one makes an affirmative representation that the plant will definitely *not* be built on the

property, one must know that such statement is false. On appeal, we review the evidence in the light most favorable to the prevailing party and reverse only if, as a matter of law, the evidence fails to meet the test of being clear and convincing. *Pace*, 247 P.2d at 274. It does not matter that there is some testimony to the contrary; what matters is whether there is a sufficient basis for the trial court to find, by clear and convincing evidence, that Mr. Strong made a knowing misrepresentation. Mr. Robinson's testimony, which evidenced that Mr. Strong knew that the property was the proposed site for the hydro-electric plant, provided that basis.

structed on the property, Mrs. Schuhman immediately executed the earnest money agreement as well as paid $500 toward the purchase of the property.

Lastly, the Newmans were damaged by their reliance on Mr. Strong's representation. There was sufficient evidence at trial to support the court's finding that the Newmans "desired to purchase the property for its beauty, its location, its mountainous type terrain, its running stream and its view," and that construction of the hydroelectric power plant would affect the "purpose for which the [Newmans] desired to purchase the property."

Because all of the elements of fraudulent misrepresentation, as outlined in *Pace*, were established at trial, we conclude that the district court did not err in granting rescission of the purchase agreement.

### III.  CLOSING

■ Green River also challenges the trial court's finding that escrow was not "closed" as to require Central Utah Title to disburse the seller's proceeds to Green River. Findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Utah R.Civ.P. 52(a). "Under this standard, we do not set aside the trial court's factual findings unless they are against the great weight of the evidence or we otherwise reach a firm and definite conviction that a mistake has been made." *Southland Corp. v. Potter*, 760 P.2d 320, 321 (Utah App.1988) (citing *Western Kane County Spec. Serv. Dist. No. 1 v. Jackson Cattle Co.*, 744 P.2d 1376, 1377 (Utah 1987)).

■ Specifically, Green River argues that escrow was closed when Mr. Newman delivered the cashier's check to Central Utah Title. Therefore, Green River claims that it was entitled to the purchase funds at that point. That argument is without merit.  Closing contemplates more than just the delivery of funds to the closing agent.  Rather, a closing denotes a "final termination."  *Southcott v. Pioneer Title Co.*, 203 Cal.App.2d 673, 21 Cal.Rptr. 917, 920 (1962).  In the case at bar, delivery of the cashier's check to Central Utah Title did not effect a "final termination" for the purpose of closing escrow.  Utah Code Ann. § 31A–23–307(2)(c) (1991) provides:

> No check may be drawn, executed, or dated unless the segregated escrow account against which it is drawn contains a sufficient credit balance consisting of collected or cleared funds, at the time the check is drawn, executed, or dated.

Pursuant to section 31A–23–307, Central Utah Title could not disburse the seller's proceeds until the title company's escrow account reflected a balance of "collected or cleared funds."  At the time the check was delivered to the title company, the escrow account did not reflect that balance.  In fact, a Central Utah Title officer testified that standard practice was to wait at least one day to ensure that the title company could collect on the cashier's check.[2]  Accordingly, until the title company collected on the check or confirmed that the check would clear the account upon which it was drawn, it was not required to disburse any funds.

Further, the escrow instructions agreement, to which Green River was a party, provides: "Should a dispute or controversy arise between buyer and seller, [the title company] shall hold all monies and documents until such a time as existing differences shall have been resolved through compromise or a final judicial determination had of the rights of the parties."  Therefore, when the Newmans instructed the title company not to disburse any funds due to the alleged misrepresentation, a dispute arose between the parties, and the title company was bound, under the escrow instructions agreement, to hold all proceeds

---

**2.**  To support the reasonableness of this practice, Central Utah Title cites the 1990 amendment to section 31A–23–307 which provides in part:

> *[C]ashier's checks*, certified checks, teller's checks, U.S. Postal Service money orders, and checks drawn on a Federal Reserve Bank or Federal Home Loan Bank *may be disbursed on the day following the date of deposit* [.]  Utah Code Ann. § 31A–23–307(2)(d)(iii) (1991).

until the dispute was resolved. For these reasons, the trial court did not err in finding that escrow was not closed and the title company properly retained seller's proceeds.

## IV. ATTORNEY FEES ON APPEAL

■ Lastly, Central Utah Title claims that it is entitled to attorney fees on appeal, pursuant to the escrow agreement. The pertinent provision of that agreement provides:

> In the event you [Central Utah Title] interplead you may deposit the documents and funds in court, deducting all your charges and expenses incurred *including reasonable attorney's fees* and you will thereupon be relieved of further liability or responsibility in connection with this escrow. The parties hereto agree to save you harmless, in the event of any such disagreement between the parties, against all liability, costs, damages, expenses and attorney's fees that may arise or which may be incurred or sustained by you by reason hereof.

In *Stacey Properties v. Wixen*, 766 P.2d 1080 (Utah App.1988), *cert. denied*, 779 P.2d 688 (Utah 1989), we recited the rule for awarding attorney fees:

> As a general rule, attorney fees may be recovered in Utah only if provided for by statute or contract. *Cooper v. Deseret Fed. Sav. and Loan Ass'n*, 757 P.2d 483, 486 (Utah App.1988). If attorney fees are recoverable by contract, "[a] party is entitled only to those fees attributable to the successful vindication of contractual rights within the terms of [the] agreement." *Trayner v. Cushing*, 688 P.2d 856, 858 (Utah 1984).

*Id.* at 1084.

The Utah Supreme Court has held that "a provision for payment of attorney's fees in a contract includes attorney's fees incurred by the prevailing party on appeal as well as at trial[.]" *Management Servs. Corp. v. Development Assocs.*, 617 P.2d 406, 409 (Utah 1980).

Applying the foregoing authority to the facts before us, we conclude that, pursuant to the escrow agreement signed by the parties to this case, Central Utah Title is entitled to those attorney fees on appeal which are necessary to enforce their contractual rights within the terms of that agreement.

## V. CONCLUSION

Mrs. Schuhman and the Newmans established by clear and convincing evidence that Mr. Strong knowingly made a fraudulent misrepresentation that the power plant would not be constructed on the property. Therefore, we affirm the district court's judgment granting rescission of the earnest money agreement. Further, we affirm the district court's determination that escrow was not closed as to require Central Utah Title to disburse the seller's proceeds to Green River. However, we remand this case to the district court in order to (1) determine the reasonable amount of attorney fees to be awarded to Central Utah Title for this appeal, and (2) apportion those fees between the respective parties.

JACKSON, J., concurs.

GREENWOOD, Judge (concurring in part and dissenting in part):

I concur with the majority opinion on the issues affecting Central Utah Title. I respectfully dissent, however, from the majority's determination that there was sufficient evidence to support the trial court's finding that Strong made a knowing misrepresentation. The majority states that because Strong knew that lot nine was the proposed site for the power plant and was never told that the plant would not be constructed, he knowingly misrepresented that the plant would not be built on the property. However, the majority disregards evidence of what Strong knew about the status of the project at the time of his alleged misrepresentation, through a series of conversations with city officials. The majority specifically fails to consider a conversation between Robinson, the city engineer, and Strong prior to the Newman transaction, in which Robinson told Strong that if Strong was able to sell lot nine, he should do so and the city would then pro-

ceed with the plant on an alternative site. There is no evidence in the record to support the contention that Strong knew anything different than what he told Ruiz and Schuhman on the telephone prior to Schuhman paying the earnest money.

Robinson first approached Strong in 1988 about the possibility of constructing the power plant on lot nine. Robinson testified that at that time the city was not "to the point of detail design to even buy land. We didn't know if the funding would be there. We just talked conceptually about it." Both Robinson and Strong testified that in the following months they spoke periodically and Robinson gave Strong status reports about the city's plans. Although, as the majority points out, Robinson never told Strong that the plant would not come to fruition, it was clear that construction was uncertain. Robinson told Strong that there were contingencies in addition to obtaining funding that must be met before the project could begin.

Strong testified that in the summer of 1989, before he listed the property for sale, he and Robinson had a conversation in which Robinson told him the funding had not yet been approved and the city was still reviewing the feasibility of the project. Strong told Robinson that he had "had opportunities to sell the lots, and lot nine, in particular, and [Robinson] said, 'If you have an opportunity to do that, all I can tell you is to go ahead and do it, and if we have a project, we'll locate it *off the subject property.'*" Strong testified that on more than one occasion prior to the Newman transaction, Robinson told Strong that the project would be moved off his property to another site. Robinson did not refute or dispute Strong's description of those conversations. Strong listed the property and on August 2, 1989, the Newmans, through Schuhman, offered to buy it.

As late as spring of 1990, several months after the Newmans' closing, the city was still unable to proceed with the project because its feasibility was still in question, plans had not been prepared, and funding had not been approved.

All the testimony at trial is consistent that Strong believed that no power plant would be built on lot nine if he sold it. The city did not have a firm location for the plant and had not finalized funding or feasibility for the project at the time of the sales transaction with the Newmans. In fact, the city administrator, Vern Fisher, originally told Schuhman after the closing that the power plant would likely not be located on the Newmans' property. Schuhman testified as follows:

SCHUHMAN: [Fisher said] that the power plant may not have been on that lot, and it would be either across the creek and it would be no problem and that [the Newmans'] property, that they wouldn't even hear it. There would be water flowing through the creek and everything would be fine.

. . . .

DEFENSE COUNSEL: Now, in your conversation, if I understood what you said now, you explained that he said that the project would be removed across the stream to some other property?

SCHUHMAN: Yes.

DEFENSE COUNSEL: He told you that.

SCHUHMAN: That's what he said he thought. He wasn't sure.

DEFENSE COUNSEL: He wasn't sure. And so the project, according to that conversation, would not be built on the property that your parents were purchasing from the Green River Motel; is that right?

SCHUHMAN: Right. He assured me of that fact. So I felt gratified that they had purchased the property and there would be no power plant.

Strong's statement, as found by the trial court, that the plant would not be built on the property was consistent not only with what he knew at the time, but also with the knowledge of city officials bearing responsibility for the power plant project and, therefore, in a better position to know the actual facts. The trial court used Strong's statement that the plant would not be built *on* the property and linked it to a finding that the Newmans would not have completed their purchase if they had known the

plant would be built on *or near* the property. Yet there is no finding that Strong made *any* representation, whether true or not, about the possibility of a power plant *near* the property. There was no evidence to refute the truth of Strong's statement, as he knew the truth to be, that the plant would not be built *on* the property. It was not until later, when Fisher told Schuhman that the plant would be piped underground, that the Newmans decided they did not want the property.

Schuhman and the Newmans had the burden of proving by clear and convincing evidence that Strong knew the power plant would be constructed on the property when he told Schuhman and Ruiz that it would not be. There is no evidence that shows Strong knew anything different than what he told Ruiz and Schuhman or that he knowingly made a misrepresentation. Therefore, I would reverse.